# IN THE COURT OF APPEALS OF IOWA

No. 20-1523
Filed April 14, 2021

**IN THE INTEREST OF B.C.,**
**Minor Child,**

**C.C., Mother,**
        Petitioner-Appellant,

**G.T., Father,**
        Respondent-Appellee.
_____

        Appeal from the Iowa District Court for Linn County, Russell G. Keast, District Associate Judge.

        The mother appeals the district court's denial of her Iowa Code chapter 600A (2019) petition to terminate the father's parental rights. **REVERSED AND REMANDED.**

        Patricia J. Meier of Nidey, Erdahl, Meier & Araguás, PLC, Cedar Rapids, for appellant mother.

        Laura J. Lemos of John C. Wagner Law Offices, P.C., Amana, for appellee father.

        Kara L. Bullerman of Allen, Vernon, & Hoskins, PLC, Marion, attorney and guardian ad litem for minor child.

        Considered by May, P.J., and Greer and Schumacher, JJ.

**GREER, Judge.**

The mother appeals the denial of her petition to terminate the father's parental rights to B.C., who was born in 2010. The mother alleged two statutory grounds for termination: abandonment and conception as a result of sexual abuse. *See* Iowa Code § 600A.8(3), (11) (2019). The district court found one of the statutory grounds for termination was proved—the child was conceived as a result of sexual abuse—but concluded termination is not in B.C.'s best interests.

"Private termination proceedings under Iowa Code chapter 600A are a two-step process." *In re B.H.A.*, 938 N.W.2d 227, 232 (Iowa 2020). First, the petitioning parent "must . . . prove by clear and convincing evidence the grounds for ordering termination of parental rights." *Id.* (citing Iowa Code § 600A.8). And second, the petitioning parent "must prove by clear and convincing evidence that termination is in the best interest of [the child.]" *Id.* We review private termination proceedings de novo. *Id.* In undertaking our review, we remember the best interests of the child is the "paramount consideration" in a private termination action. *See id.*

To begin, we note the mother spends much of her appellate brief arguing the court should have also found the father abandoned B.C., pursuant to section 600A.8(3). Similarly, the father spends much of his brief arguing the district court got it right because he did not abandon his son. But this issue is inconsequential. Only one statutory ground for termination is necessary, and the father does not contest the district court's ruling B.C. was conceived as a result of sexual abuse.[1]

---

[1] At the time B.C. was conceived, the mother was fifteen years old and the father was twenty-three. *See* Iowa Code § 709.4(1)(b)(3)(d) (providing a person commits

*See* Iowa Code § 600A.8(11); *see also In re B.L.A.*, 357 N.W.2d 20, 22 (Iowa 1984) (providing, in a private termination action, "if one of the grounds for termination is established by clear and convincing evidence, the termination will be upheld").

Because it is undisputed that the mother met the first step, our decision hinges on whether termination of the father's parental rights is in B.C.'s best interests. In determining whether termination is in the best interests of the child, we consider the statutory definition:

> The best interest of a child requires that each biological parent affirmatively assume the duties encompassed by the role of being a parent. In determining whether a parent has affirmatively assumed the duties of a parent, the court shall consider, but is not limited to consideration of, the fulfillment of financial obligations, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the child, and demonstration of the establishment and maintenance of a place of importance in the child's life.

Iowa Code § 600A.1. We also look to "best interests" as outlined in chapter 232. *B.H.A.*, 938 N.W.2d at 232. It directs us to "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). And we look both forward, into the child's future, and backward, into the parents' past. *See B.H.A.*, 938 N.W.2d at 233 ("[W]e look to the child's long-range as well as immediate interests. Hence we necessarily consider what the future likely holds for the child . . . . Insight for this determination can be gained from evidence of the parent's past performance, for that

---

sexual abuse in the third degree when they perform a sex act with someone who is fourteen or fifteen and they are "four or more years older" than the other person).

performance may be indicative of the quality of the future care that parent is capable of providing." (quoting *In re Dameron*, 306 N.W.2d 743, 745 (Iowa 1981))).

Here, the district court decided termination of the father's parental rights is not in B.C.'s best interests, finding any lack of bond or relationship between B.C. and the father was the result of the mother's "pattern and practice of actions to prohibit [the father] from having continuous and meaningful contact with this son." Additionally, the court concluded, "[I]f given the opportunity, the father will provide developmental, emotional and financial support for the child in the future. Such action will create an opportunity for a bond to form between the father and the child that has heretofore [been] prevented by the calculated and overt acts of the mother."

The district court was critical of the mother for keeping the father out of B.C.'s life, stating:

> It is clear from the evidence presented that the [mother] felt that she could dictate [the father's] access to the child from the beginning. She testified that after [B.C.'s] birth she received constant telephone and written contact from [the father] while he was incarcerated. She further testified that after three months she decided that she was no longer going to accept his communication and began blocking his calls and returning his letters. It was not until [B.C.] was four years old that she felt compelled to reach out to the [father] to provide him access to his son.

We take issue with this. The district court recognized the mother was the victim of the father's sexual battery, for which he was convicted, incarcerated, and made to register as a sex offender, but it held the then-sixteen-year-old mother's decision to end communication with the incarcerated perpetrator against her. We are not suggesting the father was devoid of the right to some contact with his son while he

was in jail,[2] but we question how much contact the mother could fairly be expected to facilitate between the father and B.C.[3]  The father's testimony painting his relationship with the mother prior to his incarceration as generally positive and consensual—claiming the mother, at thirteen years old to his twenty one, initiated the relationship—does not change our opinion.

Still, it seems the mother did facilitate some contact between the father and B.C. until the mother, the mother's now-wife, and B.C. moved to Iowa in July 2016. From early 2015, after the father reacquainted with the nearly five-year-old child, he made no effort to establish any formal visitation schedule with the child—even after only seeing him sporadically—until after the mother moved out of state.  Then, around the time of their move, the mother unilaterally decided to end the relationship between the father and B.C.  She refused to tell the father or his family where she and B.C. moved; would not communicate with the father by phone or online; and even represented to the California court when the father attempted to establish custody that B.C. could be the biological child of another man because she did not have a paternity test.

The evidence established the father professed love for the child and he made an effort to have a parental role in B.C.'s life in the distant past.  Additionally,

---

[2] Neither party introduced into evidence any no-contact or protective orders.

[3] When the mother was fifteen, she hid the twenty-three-year-old father in her home for two months until he physically assaulted her and she told her mother he was there.  Ultimately, the mother left with the father for Mexico and was listed as an endangered runaway by the National Center for Missing and Exploited Children. The mother testified that, while living with him in Mexico as a pregnant minor, the father choked and hit her physically two or three times a week.  She told the district court she was hospitalized after he forced her into a sexual encounter.  And the mother testified she has been engaged in counseling for the past five years to address this past sexual abuse.

the father has two other children now, and he is a caring, reliable parent to them. On the other hand, the father's stated desire to be part of B.C.'s life has not been matched by actions. Even if we credit his testimony about the steps he took to try and locate the mother and B.C. after they left California,[4] it is undisputed he knew B.C.'s location once the termination action began in August 2019 but did nothing with that information. Both the father and B.C. have been represented by counsel throughout the proceedings, but as of the September 2020 termination hearing, the father made no effort to contact B.C., through the attorneys or otherwise, during the thirteen months the case was pending. And when the father visited Iowa to attend a court proceeding in October 2019, he did not ask to see or visit B.C.[5]

At the time of the termination hearing, it had been more than four years since B.C. and the father had any contact. Ten-year-old B.C. had concerns about his future if something were to happen to his mother, and he expressed a desire to be adopted by his stepmother. The mother and stepmother had been married over three years and share a son, and the stepmother testified she was interested in adopting B.C. The stepmother also noted that B.C. had no interest in re-connecting with his father. For these reasons, B.C.'s attorney and guardian ad litem supported termination of the father's parental rights, noting the father's "lack of action over the court of the last year" was unexplained and stating the father's "lack of effort to have contact or communication with [B.C.] during the course of

---

[4] We note the parties had mutual friends who knew where the mother was located and her parents lived near the father had he wanted to compel the information about her location.

[5] The father was allowed to participate in the September 2020 termination hearing by telephone.

the case do not inspire confidence that he would make the effort required to build a parent child relationship with [B.C.] . . . if his rights were to remain intact."

The district court denied the mother's petition to terminate based on the court's belief in the potential relationship the father and B.C. could have. But like the guardian ad litem did, we look to the father's past performance for insight into the future. *See B.H.A.*, 938 N.W.2d at 233. Based on the father's lack of action during the thirteen months the termination was pending, we do not believe he will provide developmental, emotional, and financial support for B.C. going forward. Moreover, as with all cases involving children, our focus is not about rewarding one parent or punishing another; it is about B.C.'s best interests. *Cf. In re Marriage of Brogden*, 344 N.W.2d 271, 273 (Iowa Ct. App. 1983) (noting, in a child-custody case, the "overriding concern" is "the best interest of the children" and "[t]he award of custody cannot be used to punish one parent or reward another"). At the time of the termination hearing, B.C. had gone almost half of his life without contact from his father; the family he recognized was made up of his mother, stepmother, and brother, and he wanted assurance he would remain part of that family even if something happened to his mother. For these reasons, we find termination of the father's parental rights is in B.C.'s interests.

We reverse the district court's denial of the termination petition and remand for entry of an order consistent with this opinion. *See B.H.A.*, 938 N.W.2d at 236 (concluding "chapter 600A's best-interest factors weigh in favor of terminating Dad's parental rights" and "revers[ing] the judgment of the juvenile court[] and remand[ing] for entry of an order consistent with this opinion").

**REVERSED AND REMANDED.**